USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/29/2017

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MEAGEN R. PIMENTEL,

                               Plaintiff,

        -against-

NANCY A. BERRYHILL,[1] ,
**Acting Commissioner of Social Security,**

                               Defendant.

**OPINION AND ORDER**

**16-CV-1385 (RLE)**

**HONORABLE RONALD L. ELLIS, U.S.M.J.:**

## I.    INTRODUCTION

On February 23, 2016, Plaintiff Meagen R. Pimentel ("Pimentel") commenced this action

under the Social Security Act (the "Act"), 42 U.S.C.§ 405(g) and 1383(c)(3), challenging a final

decision of the Commissioner of Social Security ("Commissioner") denying her application for

Supplemental Security Income Benefits ("SSI"). (Doc. No. 1.) On October 3, 2016, Pimentel

filed her motion for judgment on the pleadings, asking the Court to reverse the decision of the

Commissioner, or, alternatively, remand the case for further proceedings. (Doc. Nos. 19-20.)

Pimentel argues that her condition satisfies the requirements for listing 12.05.C, and remand is

unnecessary. (Doc. No. 20, Pl.'s Mem. of Law for J. on the Pleadings ("Pl.'s Mem.").) On

December 2, 2016, the Commissioner filed its motion to remand this matter for additional

administrative proceedings and its opposition to Pimentel's motion for judgment on the

pleadings. (Doc. No. 22, Def. Mot. to Remand ("Def's Mot.").) The Commissioner concedes

that the Administrative Law Judge ("ALJ") failed to properly develop the record and assess

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the title of this action is revised to automatically substitute the name of the current Acting Commissioner of Social Security.

whether Pimentel's condition met the 12.05.C listing requirements. The Commissioner argues, however, that finding Pimentel disabled and awarding her benefits is not an appropriate remedy. (Def.'s Mot. at 4, 6.) On December 23, 2016, Plaintiff filed a reply. (Doc. No. 23.)

For the reasons that follow, Pimentel's motion is **DENIED**, the Commissioner's motion is **GRANTED**, and the case is **REMANDED** for further administrative proceedings.

## II.    BACKGROUND

### A.    Procedural History

Pimentel applied for SSI on August 23, 2011, when she was 20 years old, alleging disability beginning August 1, 2000. (Tr. at 105.) Pimentel alleges disability because of her diagnoses of Attention-Deficit Hyperactivity Disorder ("ADHD") and a learning disorder. (*Id.* at 60.) Pimentel's application was initially denied on December 14, 2011. (*Id.* at 56.) On January 26, 2012, Pimentel submitted a request for a hearing before an ALJ. (*Id.* at 62.) On December 20, 2012, a hearing was held before ALJ Wallace Tannenbaum ("ALJ Tannenbaum" or "the ALJ"). (*Id.* at 32.) Pimentel, her aunt Anna Hernandez ("Hernandez"), and her attorney James Baker ("Baker") were also present at the hearing. *Id.* On January 3, 2013, ALJ Tannenbaum issued a decision denying Pimentel's SSI claim on the grounds that she was not disabled within the meaning of the Act since the date her application was filed. (*Id.* at 18, 26.) On March 6, 2013, Baker submitted a request for review of the ALJ's decision to the Appeals Council. (*Id.* at 14.) On May 6, 2014, the Appeals Council denied Pimentel's request for review of the ALJ's decision. (*Id.* at 1.)

On July 8, 2014, Pimentel filed a Complaint challenging the final decision of the Commissioner denying her application for SSI based on disability. (Doc. No. 2 of

2

Docket Number 14-CV-5078). On November 4, 2014, the Parties stipulated to remand Pimentel's claim for further administrative proceedings. (Tr. at 290, 292.) On May 29, 2015, the Appeals Council vacated the final decision of the Commissioner and filed an order remanding the case to the ALJ. (*Id.* at 365.)

The Appeals Council directed the ALJ to (1) "[o]btain additional evidence concerning [Pimentel's] impairments to complete the administrative record in accordance with the regulatory standards, including an updated psychological consultative examination," (2) "[e]valuate [Pimentel's] mental impairment in accordance with the special technique described in 20 CFR 416.920a . . . ," (3) "[g]ive further consideration to the treating and nontreating source opinion . . . ," (4) "[g]ive further consideration to the claimant's maximum residual functional capacity [("RFC")] and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations," and (5) "[i]f warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . ." (*Id.* at 366.)

On December 1, 2015, another hearing was held before ALJ Tannenbaum, where Pimentel, Hernandez, and Baker were present. (*Id.* at 32.) On December 21, 2015, ALJ Tannenbaum issued a decision denying Pimentel's SSI claim on the grounds that she was not disabled within the meaning of the Act since the date her application was filed. (*Id.* at 277, 285.) Pimentel filed her Complaint in this matter on February 23, 2016. (Doc. No. 1.)

**B.    The ALJ Hearing**

    **1.    Administrative Hearing Testimony on December 20, 2012**

Pimentel was born on February 13, 1991. (Tr. at 34.) She lives with her aunt, Hernandez, who had custody of Pimentel since she was seven years old. (*Id.* at 44.) Pimentel does not see her mother or father "that much." (*Id.* at 37.) Pimentel attended a special education high school where she graduated in June 2012 at twenty-one years old. (*Id.* at 39-40, 49.) While in high school, Pimentel had an internship at the school's library. (*Id.* at 35.) Her job responsibilities included "pull[ing book] holds," filing books, and helping people that came into the library. (*Id.* at 35, 50.) After the internship, Pimentel went to a sixty-day study program every day to look for an "administrating" job, where she also worked on her typing skills and on Microsoft Office programs. (*Id.* at 38.) She stayed in this program until it was time for her to do a "job search." *Id.* Hernandez testified that Pimentel takes the train to school,[2] leaving at 7:30 a.m., and returning at 4:00 p.m. (*Id.* at 49-50.)

When questioned by the ALJ, Pimentel testified that she has lived with her aunt for the past four years, but when questioned by Baker, Pimentel testified that she has been living with Hernandez since she was 8 years old. (*Id.* at 33, 39, 44.) When questioned by the ALJ, Pimentel testified that she graduated from high school in 2010, but when questioned by Baker she testified that she graduated in 2012. (*Id.* at 36, 39-40.)

Pimentel testified that she sometimes needs to be reminded by her aunt to take out the garbage, to clean her room, to wash her hair, to brush her teeth, and to bathe or shower. (*Id.* at 41-42.) Hernandez corroborates this testimony. (*Id.* at 44-45.) Pimentel testified that she can travel independently to familiar locations but tends to forget directions to unfamiliar locations

---

[2] It is not clear from the record which "school" Pimentel is referring to, but it appears she is referencing her college program.

4

and usually needs help from someone. (Tr. at 42-43.) Hernandez testified that as an example, there was "going [to be] a meeting in the [employment] program in a different location [than usual], and what happened was instead of going to Queens [Pimentel] went to Brooklyn, and we had to keep her on the phone for over . . . two and a half, three hours . . . trying to get her to a train." (*Id.* at 44.) Hernandez testified that Pimentel typically does not cook independently and could maybe make a "scrambled egg" on her own. (*Id.* at 45-46.) Hernandez believes that Pimentel "feels very scared to be cooking on her own." (*Id.* at 46.) Hernandez testified she buys Pimentel's clothes, and does not help her in dressing with "sporty" outfits like "jeans and a top," but does with "dresses, and shoes, and boots." (*Id.* at 46-47.) Hernandez testified that Pimentel "ties her shoes like a very young person." (*Id.* at 47.) Hernandez does not believe that Pimentel can tell time. (*Id.*)

Pimentel hangs out with her friends on the weekend at the movies or the mall. (*Id.* at 36-37.) She likes to read, use the computer, and use the Internet. (*Id.*) Hernandez testified that Pimentel's special education school helped her communicate with friends, and the first time Pimentel had a friend was around the age of fourteen or fifteen. (*Id.* at 51.) Hernandez testified that Pimentel is "computer literate." (*Id.* at 50.)

Baker testified that Pimentel has a full scale I.Q. of 69, and believes the results of the tests will show "she has really very severe and specific memory losses"; short-term memory being at the one-percent level and long-term memory being "kind of off the charts" at beneath the lowest one-tenth of the one-percent level. (*Id.* at 38-39.) Baker states that Pimentel "has a marked limitation in attention and concentration, and . . . a marked limitation in her activities of daily living." (*Id.* at 39.) Baker notes that Pimentel's memory issues are "pretty severe." (*Id.* at 40.) Baker also states that Pimentel is currently in a program "designed to get her employment,"

but he does not "think we need to be concerned about [Pimentel] striving to have a normal life," despite not knowing "whether [the employment search is] going to be successful." (Tr. at 52.)

Pimentel has never received public assistance or Supplemental Security Income Benefits. (*Id.* at 45.) She was not seeing a therapist or mental health professional at the time of the hearing. (*Id.* at 37.) Pimentel alleges disability beginning on August 1, 2000, when she was nine-years old. (*Id.* at 105.)

### 2.    Administrative Hearing Testimony on December 1, 2015

Pimentel was twenty-four years old at the time of the second hearing, and continues to live with Hernandez. (Tr. at 297.) Pimentel attends Hostos Community College as a sophomore, studying full-time to be a dental hygenist. (*Id.* at 297-98, 301.) Pimentel spends three hours per day, five days per week at school. (*Id.* at 298.) She does not participate in any extracurricular activities. (*Id.*) She will attend two more years of school before she can become a dental hygienist. (*Id.* at 303.) Hernandez testified that she has had custody of Pimentel for fourteen or fifteen years, and Pimentel has lived with her the entire time. (*Id.* at 306-07.) Pimentel never had an independent job where she received a regular paycheck. (*Id.* at 310.) Pimentel does not have an income and never has had an income. (*Id.* at 316.)

Pimentel testified that she has been seeing a psychiatrist for two years "to open up more." (*Id.* at 302.) Hernandez testified that Pimentel was recommended to see a psychiatrist because she needs "someone to talk to" and someone "to express herself" to. (*Id.* at 317.) Hernandez testified that Pimentel has problems communicating, and treatment helps. *Id.* Hernandez also noted that Pimentel "needed some type of support [so] that she could go to school and . . . make it in life." (*Id.*)

Hernandez testified that Pimentel incorrectly stated that she has lived at their present address for only eight years; in fact, Pimentel has lived there since she was seven years old. (Tr. at 297, 307.) Hernandez testified that Pimentel has significant problems with memory, especially short-term memory. (*Id.* at 307-09.) Hernandez states that Pimentel "can't remember things" and "you have to prompt her to remember certain things that we tell her to do." (*Id.* at 308.) Hernandez noted that Pimentel has difficulty retaining and executing instructions quickly and forgets things within an hour. (*Id.* at 309.) Hernandez testified that Pimentel still has trouble traveling and is accompanied to new places. (*Id.* at 317-18.) "If it is a steady place that [Pimentel is] going to [] on a daily basis, she could do that on her own once [someone has] shown her." (*Id.* at 318.) Hernandez stated that Pimentel has "gotten a little better with [personal] hygeiene" and sometimes Hernandez helps Pimentel pick out appropriate clothes for the day. (*Id.* at 315-16.) Hernandez testified that Pimentel is "very limited in cooking"—she can cook rice in a rice cooker and make a scrambled egg, but sometimes does it with supervision. (*Id.* at 315.)

Hernandez testified that she "encouraged [Pimentel] to go to college because [they] didn't have any success in the two year [employment] program." (*Id.* at 309.) Pimentel filled out approximately ten applications while in the program but "was never ever called back." (*Id.* at 309, 312.) While in the program, Pimentel interned at a library, worked for one to one and half years, received a stipend,[3] and could not be fired. (*Id.* at 309-11.)

---

[3] Pimentel's earnings in 2011 and 2012 come solely from a stipend received from Cooke Academy. (*Id.* at 458.) The February 15, 2012 Earnings Report states Pimentel's earnings were $829.00 for 2011, and $0.00 for 2012. (*Id.* at 116.) The June 13, 2015 Earnings Report states Pimentel's earnings were $829.00 for 2011, and $344.38 for 2012, totaling $1,173.38. (*Id.* at 455.)

Pimentel has friends from school that she texts and socializes with, but she does not go places with them often. (*Id.* at 299-301.) Hernandez states that Pimentel is less social now, only seeing friends once or twice a month, because Hernandez told Pimentel that "if she wanted to be successful, she was going to have to give up certain things." (Tr. at 313.) Hernandez testified that Pimentel is "trying to study longer hours." (*Id.*) Pimentel testified that she likes to listen to the radio and does "a little" cooking at home. (*Id.* at 300-01.)

Baker testified that Pimentel took two extra years to graduate from a "private special education high school, paid for by [Hernandez]," and has not been in public school since the age of eight. (*Id.* at 303.) After graduating high school, Pimentel was assigned to an "Access VR Program run by the New York State Office of Vocational Rehabilitation." (*Id.*) The program was supposed to help her find employment by giving her basic job readiness skills. (*Id.* at 304.) Baker states that "[a]lthough [Pimentel] attended [a skills readiness] program for two years, she did not have, despite a number of job interviews . . . [any] success in getting employment." (*Id.*) Baker further noted that although "[Pimentel] is in a program at Hostos Community College to turn her into a dental hygienist," Pimentel "[has to pass remedial math and reading courses" before beginning her coursework. (*Id.*) Pimentel has "failed the remedial math section twice" and is "having difficulty with all her courses." (*Id.*)

Hernandez corroborated Baker's description of Pimentel's status in college, and explained that Pimentel is currently enrolled in four classes. (*Id.* at 312-15.) Hernandez noted that Pimentel needs a 3.0 grade point average ("GPA") to begin the dental hygienist program but Hernandez believes Pimentel's GPA is a 2.6. (*Id.* at 304, 313.) Baker testified that Pimentel's "learning . . . issues … may eventually lead to employment as a dental hygienist," or "[i]t may not." (*Id.* at 304.) Baker states that Pimentel's efforts in seeking employment "does not

necessarily mean she does not meet a [disability] listing," arguing that "she meets the [] listing 12.05C." (*Id.* at 303, 305.) Baker further notes that the examiner of Pimentel's I.Q. test in 2013 "concluded that her [adaptive] functioning was . . . considerably worse in . . . the areas of communication and daily living skills" than what to be "expect[ed] [of someone] with an [I.Q.] of 69 or 72." (Tr. at 305.) The ALJ responded, stating that"[p]ut[ting] the examinations aside, if I may, Mr. Baker. It was impressive when your client testified before me." (*Id.* at 306.)

### 3. Medical Evidence and Opinions

#### a. Mental Impairment Evidence

##### (1) Ludovica Brigatti, EdM, Psychoeducational Report

Ludovica Brigatti ("Brigatti") is Cooke Center Academy's ("Cooke Academy") school psychologist. (Tr. at 117.) Pimentel was referred to Brigatti by Cooke Academy's Director of Transition, Bethany Chase, "to help in planning for post-secondary education programs." *Id.* This report was generated during a one-time evaluation of Pimentel on March 17, 2010. *Id.*

On March 17, 2010, Pimentel saw Brigatti and "background information and history were obtained from previous evaluations, school records, and Pimentel's school counselor." (*Id.* at 117.) Brigatti notes that "[Pimentel's] mother reportedly consumed alcohol during [her] pregnancy." *Id.* "[Pimentel] began experiencing academic difficulties related to attention problems in the 1st and 2nd grades," and "[i]n the 4th grade she was evaluated and classified as Learning Disabled, but did not receive additional services." *Id.* "An evaluation conducted in 2006 at New York Presbyterian Hospital found [Pimentel's] overall intellectual abilities to be in the Borderline Range, while her basic academic skills varied and fell between the Average to Bordeline range." *Id.* "In 2003, [Pimentel] underwent a psychological evaluation due to reported restlessness, distractibility, and poor organizational skills," and "was diagnosed with

9

Attention Deficit Disorder." *Id.* She was "prescribed Adderall, which she has since discontinued." (Tr. at 117.) Brigatti reported that behaviorly, Pimentel "needed numerous breaks in between subtests." (*Id.*)

Brigatti administered the Woodcock-Johnson III Tests of Cognitive Abilities ("WJ III COG") and the Woodcock-Johnson III Tests of Achievement ("WJ III ACH"). (*Id.* at 118.) Pimentel's scores on the WJ III COG "ranged from Very Low to Low Average representing normative weaknesses in comparison to same age peers." (*Id.* at 123.) Pimentel's "Long-Term Retrieval Factor" score, which "measures an individual's ability to store and retrieve information efficiently" was "Very Low," scoring in less than the first percentile. (*Id.* at 119.) Her "Short Term Memory Factor" score, which measures "memory span and working memory abilities specifically the ability to apprehend and hold information in immediate awareness and then use it within a few seconds," was similarly "Very Low" and in the first percentile. (*Id.* at 121.) Pimentel scored a 69 on the "General Intellectual ability" ("I.Q.") test, which is in the second percentile and considered "Very Low." (*Id.* at 118.) Brigatti concluded that Pimentel's "overall cognitive functioning as measured by the WJ III COG is in the Very Low range." (*Id.* at 118, 121.) Brigatti also stated that Pimentel's "performance on all factors represent normative weaknesses in comparison to same age peers." (*Id.* at 121.) Brigatti noted that Pimentel "exhibited personal strengths in her ability to perform automatic cognitive tasks and verbal comprehension." (*Id.* at 119.)

On the WJ III ACH, Pimentel scored "Low" in the "Oral Language Cluster Factor," "Low Average" in the "Broad Reading Factor," "Very Low" in the "Broad Mathematics Factor," and "Average" in the "Broad Written Language Factor." (*Id.* at 119.) Brigatti concluded that "[Pimentel's] overall functioning in areas of academic achievement falls in the Low to Average

range," where "[w]riting, spelling and reading fluency stood out as distinct personal strengths, while receptive language, reading comprehension, and writing and math fluency were normative and relative weaknesses." (Tr. at 122.)

In Brigatti's overall summary, she noted that Pimentel "demonstrated personal strengths in Processing Speed and Comprehension knowledge," but "[h]er weakest performance was in the areas of Long-Term Retrieval and Short-Term Memory making learning, retaining, and retrieving information particularly challenging." (*Id.* at 123.) Brigatti concluded that "[b]ased on the results of [Pimentel's] aptitude testing [she] is performing at predicted levels in reading, mathematics, written language, and oral language." (*Id.*) Brigatti states that Pimentel "seems to have acquired basic decoding, reading comprehension, and math skills, although they still fall well under grade level," and she "exhibits great academic difficulties with higher level academic skills such as complex problem solving, comprehension, and oral expression." (*Id.*)

### (2) Dr. Michael Alexander, Ph.D., Psychologist

Dr. Michael Alexander ("Dr. Alexander") is a psychologist at Industrial Medicine Associates, P.C. (*Id.* at 251.) He performed a one-time consultative examination of Pimentel on December 2, 2011. (*Id.* at 251, 254.) Dr. Alexander states in his report that "[Pimentel] has never been employed," and that Pimentel indicated that the "full time school work program for the past two years . . . is going well." (*Id.* at 251.) "[Pimentel] was seeing a psychiatrist in 2007" and she "may have been seen for [ADHD]," but has not received treatment since then. (*Id.*) Dr. Alexander noted that Pimentel's "current functioning" is mostly normal with no evidence of symptoms indicative of mental illness, but that she "reports a history since childhood having difficulty focusing in school." (*Id.*) Dr. Alexander states, however, that "[Pimentel] has

not sought treatment for this in recent years and [she indicated that] it is no longer a problem for her." (*Id.*)

Dr. Alexander reports that during the "mental status examination" Pimentel "presented as a cooperative, friendly, and alert female." (Tr. at 252.) Dr. Alexander states that "[Pimentel's] manner of relating and social skills were adequate." (*Id.*) Dr. Alexander found that Pimentel's "attention and concentration" and "recent and remote memory skills" were both "[i]ntact." (*Id.*) Dr. Alexander found Pimentel's "cognitive functioning" is "estimated to be somewhat below average." "[Pimentel] is able to dress, bathe and groom herself," and "[h]er aunt has always done the cooking, cleaning, and manages the money." (*Id.* at 252-53.) Pimentel "can go shopping independently, but [she] states she has difficulty counting money at times," and "can take public transportation for short and familiar trips, but prefers not to as she easily gets lost." (*Id.* at 253.)

Dr. Alexander's "medical source statement" indicates that Pimentel "can follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasts, and perform complex tasks independently within the scope of her intellectual ability, which appears to be somewhat limited." (*Id.*) Dr. Alexander "rules out learning disorder, NOS"[4] does not find that Pimentel has any diagnoses under Axis I, and does not list any diagnoses under Axis II and III.[5] (*Id.*) Dr. Alexander states that "[t]he results of this examination do not appear to be consistent with psychiatric problems which would interfere with [Pimentel's] ability to function on a daily

---

[4] "NOS" means "not otherwise specified." Steve Bressert, *Psychotic Disorder: Not Otherwise Specified (NOS)*, PSYCHCENTRAL, https://psychcentral.com/disorders/psychotic-disorder-not-otherwise-specified-n (May 18, 2017).
[5] These diagnoses reflect the use of the American Psychiatric Association's multi-axial system, which assesses an individual's mental and physical condition, with each of five axes describing a different class of information. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000) ("DSM–IV–TR"). Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions. *Id.*

basis." (*Id.* at 253.) He recommends that Pimentel "[c]ontinue with [the] full time work program," and notes Pimentel "may need assistance to manage funds." (*Id.* at 253-54.)

### (3)    Dr. T. Inman-Dudon, Psychologist

Dr. T. Inman-Dudon ("Dr. Dudon") is a state agency psychologist who performed a psychiatric review and mental RFC review of Pimentel on December 13, 2011. (Tr. at 255, 269.) The "Psychiatric Review Technique" addresses organic mental disorders, schizophrenic, paranoid and other psychotic disorders, affective disorders, mental retardation, anxiety-related disorders, somatoform disorders, personality disorders, substance addiction disorders, and autism and other pervasive developmental disorders. (*Id.* at 255.) Dr. Dudon found that Pimentel could only fit into the category of listing "12.02 Organic Mental Disorder." (*Id.*) Dr. Dudon found that there is "[a] medically determinable impairment [] present that does not precisely satisfy the diagnostic criteria" for the "12.02 Organic Mental Disorders" listing. (*Id.* at 256.) She indicates that Pimentel's impairment to be a "LD," or learning disorder, and ruled out boderline intellectual functioning. (*Id.*) Dr. Dudon did not find that Pimentel's condition satisfies any of the four items for listing "12.05.C Mental Retardation."[6] (*Id.* at 259.)

During the "Mental [RFC] Assessment," Dr. Dudon found that Pimentel's "understanding and memory" ranges from "not significantly limited" to "moderately limited," her "sustained concentration and persistence" ranges from "not significantly limited" to "moderately limited," her "social interaction" is "not significantly limited," and her adaptation ranges from "not significantly limited" to "moderately limited." (*Id.* at 270.) Dr. Dudon did not check off "markedly limited," the highest limitation, for any of the categories regarding Pimentel's "mental [RFC]." (*Id.* at 269-70.)

---

[6] The listing items include "[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." (Tr. at 259.)

During the "functional capacity assessment," Dr. Dudon reported that Pimentel has "[n]o current treatment or psy meds" and Pimentel indicated that she "always has difficulty focusing in school," but "no treatment [has been] sought." (Tr. at 271.) Dr. Dudon states that Pimentel is "independent in hygiene, grooming, lives [with] aunt who does cooking[,] chores[,] manages money," and Pimentel "has difficulty counting money at times but does shop independently, uses public transportation for short or familiar trips (easily gets lost), has friends, [and] attends school." (*Id.*) Dr. Dudon concluded that Pimentel "appears capable of low SVP work activity." (*Id.*)

### (4)     Dr. David Louick, Ph.D., Psychologist

Dr. David Louick ("Dr. Louick") is a supervising psychologist at Association for the Help of Retarded Children ("AHRC") Family and Clinical Services in New York, NY.[7] (Tr. at 489, 496.) Pimentel was referred to Dr. Louick after Hernandez requested psychologist testing "in order to determine eligibility for OPWDD[8] services, as well as employment assistance." (*Id.* at 489.) Pimentel saw Dr. Louick on February 13, 2013. (*Id.*)

Dr. Louick noted that "Hernandez obtained full custody of [Pimentel] in 1998" after "petition[ing] the court for full custody since she felt that [Pimentel's] mother was neglectful, especially in regard to [Pimentel's] educational needs." (*Id.*) Dr. Louick wrote that Hernandez "reported there were no complications during [Pimentel's] mother's pregnancy and no noticeable developmental delays in her childhood other than toilet training, which she accomplished at age four or five." (*Id.*) Pimentel repeated first grade because "the school determined" that "she was not on grade level." (*Id.*) "In second grade, [Pimentel's] teachers started reporting that

[7] AHRC NEW YORK CITY, HTTPS://WWW.AHRCNYC.ORG (LAST VISITED JUL. 25, 2017).
[8] "OPWDD" stands for "Office for People with Developmental Disabilities." NEW YORK STATE OFFICE FOR PEOPLE WITH DEVELOPMENTAL DISABILITIES, HTTPS://OPWDD.NY.GOV/ (LAST VISTED JUL. 25, 2017).

[Pimentel] was having trouble focusing in class." (*Id.*) Hernandez reported to Dr. Louick that the Board of Education evaluated Pimentel in third grade, assessing that Pimentel's "math skill [was] below average and determined that [Pimentel] demonstrated delays in her fine motor development," but "no additional services were provided since [she] attended a private school." (Tr. at 489-90.) Dr. Louick states that a copy of that evaluation was not provided to him.[9] (*Id.*) "When [Pimentel] was 11-years-old she was diagnosed with [ADHD]," was "prescribed Ritalin and saw a psychologist regularly to address her symptoms of ADHD." (*Id.* at 490.)

Dr. Louick also noted that "[b]efore starting 9th grade, [Pimentel] was evaluated at Columbia Presbyterian Medical Center" and that "[t]he evaluation was not provided,[10] but [] Hernandez reported that the evaluator diagnosed [Pimentel] with a learning disability, ADHD and Mental Retardation." (*Id.*) "[Pimentel's] Individualized Education Plan [("IEP")] classified her as Learning Disabled, and she was provided with the related services of occupational, physical and speech therapy throughout high school." (*Id.*) "Hernandez reported that [Pimentel] is still having trouble finding a job, despite being enrolled in the VESID program." (*Id.*) Hernandez also reported that Pimentel "stopped taking Ritalin in 12th grade, as the need for it decreased, however, [Pimentel] reported that she still has some trouble concentrating while at the program." (*Id.*) Hernandez also reported that she is concerned about Pimentel's "poor memory" and she is "troubled by the daily need to remind [Pimentel] to take care of her personal hygiene." (*Id.*) Dr. Louick reports that Pimentel "denied any history of medical [] psychiatric hospitalizations" and is "currently not prescribed any medication." (*Id.*)

Dr. Louick also observed that Pimentel "spoke in full sentences, clearly articulated her words and made good eye contact with the examiner." (*Id.*) Dr. Louick noted that Pimentel

---

[9] Such an evaluation was not included in the SSA transcript provided to the Court.
[10] Such an evaluation was not included in the SSA transcript provided to the Court.

"was not actively engaged in the conversation [and] her attention appeared to drift." (*Id.*) Dr. Louick also reported that Pimentel would only answer questions directed at her, and would "rarely add important details" when asked to "expand on her answer." (*Id.* at 490-91.)

Dr. Louick administered the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), where Pimentel's full scale I.Q. was 72, which is in the Borderline Range and in the third percentile. (*Id.* at 491.) Dr. Louick noted that because there is variability between Pimentel's subtest scores in "verbal comprehension," this indicates that her "verbal skills are not evenly developed," and that her composite score (falling in the "Low Average range" at 80) "may not be the best indicator of her overall verbal capabilities." (*Id.*) Because there is no variability in her "perceptual reasoning" subtest scores, her composite score of 75, is likely an "accurate indicator of her abilities in that category." (*Id.* at 492.) Because of the variability between Pimentel's subtest scores in "working memory," the composite score, 69, which is "extremely low," "may not be the best indicator of her overall capabilities and that her working memory skills are not evenly developed." (*Id.*) Because of the "significant variability" between Pimentel's subtest scores in "processing speed[,]" the "composite score [81] may not be the best indicator of her overall capabilities and that her skills are not evenly developed." (*Id.*) In summary, Dr. Louick indicated that "[t]he variability in scores may be an indication of a learning disability." (*Id.* at 495.)

Dr. Louick also administered the Vineland Adaptive Behavior Scales – Second Edition: Survery Interview Form ("VABS-II"). (*Id.* at 493.) This survey "measures an individual's ability to perform activities of daily living required for personal and social independence." *Id.* Dr. Louick noted that Hernandez "served as the respondent in completing [the survey]" and she "appeared to be a reliable reporter and it is believed that these scores are accurate reflections of

[Pimentel's] capabilities." (*Id.*) Pimentel "agreed with her aunt's responses." (*Id.*) Pimentel's adaptive behavior composite score was 46, which is "Low with Moderate Deficits," falling below the first percentile. (*Id.*)

Pimentel's "Communication" score was 21, falling within the adaptive level of "low with severe deficits" below the first percentile. (Tr. at 493.) Dr. Louick states that Pimentel's communication skills "represent an area of relative weakness." (*Id.* at 495.) She can follow "two-part instructions," but "cannot listen to a 30 minute story or information talk without adequate attention." (*Id.* at 493.) "Hernandez estimates that [Pimentel] reads and understands material on a seventh-grade level." (*Id.* at 494.)

"In the area of Daily Living Skills, [Pimentel] earned a scaled score of 47, indicating that her skills are in the Low with Moderate Deficits range and that she is performing [below the first] percentile when compared to her same-aged peers." (*Id.*) Hernandez indicated that Pimentel "washes and bathes herself, but [Hernadez] still helps [Pimentel] with drying her hair." (*Id.*) Pimentel "sometimes brushes her teeth without her aunts prompting and she sometimes covers her mouth and nose when coughing and sneezing. (*Id.*) Hernandez reports that Pimentel "does not put her shoes on the correct feet and does not hold her eating utensils correctly." (*Id.*) Pimentel does not wash dishes, does not appropriately put her clothes away, and "does not manage her own money." (*Id.*) Hernandez states that Pimentel "cannot tell time by 5-minute increments on an analogue clock and she cannot travel 5-10 miles to unfamiliar locations." (*Id.*)

Dr. Louick indicates that "[i]n the area of Socialization, [Pimentel] earned a score of 71, indicating that her skills are in the Moderately Low range and that she is performing in the 3rd percentile when compared to her same-aged peers." (*Id.*) Pimentel "sometimes understands indirect cues in conversation and she sometimes understands that others do not know her

thoughts unless she says them out loud." (*Id.* at 495.) Pimentel "cannot follow rules in complex games or sports." (*Id.*) Hernandez reports that Pimentel "can control her anger or hurt feelings after receiving constructive criticism, when plans change for reasons that cannot be helped and when she does not get her way." (*Id.*) "Her Socilization Skills . . . represent an area of relative strength." (Tr. at 495.)

Dr. Louick concludes that:

Based on [Pimentel's] cognitive capabilities, her overall adaptive behavior functioning is lower than expected. [Pimentel's] poor attention span and reported trouble with memory may have negatively affected her ability to function commensurate with her age and intellectual capability. [Pimentel's] significantly lower communication skills may be a direct result of her ADHD and inability to [remain focused] and listen to instructions and information from others. Additionally, [] Hernandez appeared to have high expectation for [Pimentel] and she may have over reported deficits in [Pimentel's] adaptive functioning. Her overall functioning is within the Borderline range (V62.89) and her performance is consistent with a reported history of a learning disability.

(*Id.* at 496.)

Dr. Louick states that Pimentel's performance on the two tests administered "should be used in her consideration for service eligibility for supportive employment, as she would benefit from the services they typically provided to individuals with similar cognitive deficits." (*Id.*)

**(5)    Elaine Janssen, L.C.S.W.**

Elaine Janssen ("Janssen") is a licensed clinical social worker in New York State, employed by AHRC in the Department of Family and Clinical Services in New York City. (*Id.* at 497, 501.) Pimentel "was referred for an evaluation in order to determine her eligibility for OPWDD services," and saw Janssen on June 12, 2013, for a Comprehensive Psychosocial Evaluation. (*Id.* at 498.) Hernandez was present during the interview. (*Id.*)

During the interview, it was revealed that Pimentel began speaking around the age of three and half and "toilet training was completed at about [four to five] years [old]." (*Id.*)

Janssen writes that Pimentel "refuses to use public bathrooms and then almost has accidents." (*Id.*) Hernandez reported that Pimentel "is very impatient and may not finish voiding when she leaves the bathroom." (*Id.*) Pimentel was "held back in kindergarten and also the 1st grade," which is when Hernandez "placed her in private school." (*Id.*) Pimentel was "tested by the Board of Education while in the 3rd grade, [11 years old], and given diagnoses of ADHD and Learning Disorder" and "[s]he was reported to have been very fidgety and being undable to focus or concentrate." (*Id.* at 498, 500.)

On Mondays, Wednesdays, and Fridays, Pimentel "goes to the Goodwill Industries job program ("Good Skills" program), from 9:00 [a.m.] to 3:00 [p.m.]." (*Id.* at 499.) "On Tuesdays and Thursdays, she sleeps in, watches television and plays video games on her iPad." (*Id.*) "On Saturdays, she goes out with friends to the movies, goes 'window wishing' (i.e., window shopping), or visits friends in their homes." (*Id.*) "On Sundays, she stays home or goes out with her aunt, eats lunch, [and/or] goes to the beach." (*Id.*) Pimentel "loves books." (*Id.*)

Pimentel's mother is 46 years old and her father is about 72 years old, and their "whereabouts are unknown." (*Id.*) According to Janssen, both Hernandez and Hernandez's mother "felt [Pimentel] was being neglected' when she was seven years old." (*Id.*) Pimentel stated that "she remembered her mother leaving her with people she did not know, friends of her mother's she claimed she was 'afraid of.'" (*Id.*) Pimentel recalls "locking herself in her room because there were strangers in her house" and recalls sometimes calling Hernandez "to come and get her" when she was left alone. (*Id.*) Janssen reports that "Hernandez took legal custody of [Pimentel] when she was [eight years old] when [Hernandez] was unable to find [Pimentel's] mother whenever [Hernandez] needed to take [Pimentel] to doctor's appointments or agencies because they required that a parent be with her." (*Id.*) Hernandez stated that "there may be some

mental illness in both [Pimentel's] mother and maternal grandmother, but the diagnosis is unknown." (*Id.*) Janssen notes that "no developmental disabilities were reported in the family." (*Id.*) Pimentel received a "general diploma" when she graduated high school, and "[passed] all Regents exams." (*Id.* at 499.)

Janssen states that Pimentel's vocational history includes "radio station-clerical work through Cooke Academy [] at age 17 [for] two months," working for a "children's dental office [at the] front desk" where she "schedul[ed], fil[ed], and [made] appointments, and call[ed] patients" from the age of 17 to 18, and worked as a "library assistant" where she "shelv[ed] books" and did "clerical work" at Cooke Academy for two years. (*Id.* at 500.) Hernandez reports that Pimentel "needs reminders for her hygiene [and] grooming skills[,] she asks for help with choosing weather-appropriate clothing[,] [she] can use all kitchen appliances and utensils." (*Id.*) Pimentel makes her own appointments and "usually attends [them] alone." (*Id.*) Janssen states that Pimentel "self-travels" using the "GPS on her cell phone because she has difficulty finding places" and she "shops with her aunt who helps her pick out clothing." (*Id.*) Pimentel is able to "read both digital and analog timepieces (the latter with prompting [from Hernandez])." (*Id.*)

Janssen notes "[p]er [Pimentel's] IEP of 5/26/2010, her overall reading level is 8th grade and overall math skills are at the 6th grade level."[11] (*Id.*) Janssen explains that Pimentel saw a psychiatrist when she was eleven "because [Hernandez] noticed that [Pimentel] would not talk to anyone, had no friends, was withdrawn and would lock herself up and read books." (*Id.*)

---

[11] The Court does not have a record of Pimentel's IEP ("Individualized Education Plan"), dated May 26, 2010. (Tr. at 124.) The Court only received Pimentel's IEP dated May 5, 2011, which indicated that, as per the teacher's estimate, Pimentel's overall reading level and her overall math skills were both at a 5th grade level. (*Id.* at 124, 126.) Pimentel's "instruction [reading] level" was 8th grade and her "calculations" skills were at a 6th grade level. (*Id.* at 126.)

Pimentel was "referred to a therapist at Mt. Sinai Hospital outpatient mental health clinic who she saw for three years, initially every week and later monthly." (*Id.*) Janssen also noted that Pimentel "was diagnosed with ADHD[,] the psychiatrist wanted to place her on Adderall[,]" and Hernandez "first refused, but [Pimentel's] therapist and the school insisted because her symptoms remained." (*Id.* at 500.) "When [Pimentel] entered the Cooke Academy, at age 15, she was taken off the medication and was reported to have done well."[12] (*Id.*)

Janssen reports that while evaluating Pimentel, her "eye contact was appropriate," "[s]he responded in full, related sentences, [and her] speech was intelligible." (*Id.*) Janssen listed Pimentel's diagnoses as follows:

> Axis I: ADHD, NOS - 314.9 (as per her aunt's report of testing done when [Pimentel] was 11 [years old] and her psychiatrist's report – documentation not provided)
> Axis II: Borderline Range of Intellectual Functioning – V62.89 (as per AHC psychological evaluation of 4/18/2013)
> Axis III: None reported
> Axis IV: Problems with primary support group; Occupational problems
> Axis V: 60[13]

(*Id.* at 501.)

Janssen reports that Pimentel's current behaviors include "impatience, anxiety about scheduling times (difficulty estimating times)," and "problems with focusing and paying

---

[12] This statement conflicts with Dr. Louick's report that Pimentel "stopped taking Ritalin in 12th grade, as the need for it decreased" (Tr. at 490.)

[13] These diagnoses reflect the use of the American Psychiatric Association's multi-axial system, which assesses an individual's mental and physical condition, with each of five axes describing a different class of information. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000) ("DSM–IV–TR"). Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to the individual's global assessment of functioning ("GAF"). DSM–IV–TR at 27–37.GAF is a numeric scale ranging from 0 through 100. A GAF score in the range of 41 to 50 signifies "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34. A GAF score in the range of 51 to 60 signifies "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. The multi-axial system has since been replaced by a more simplified, nonaxial approach in the DSM-5. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

attention." (Tr. at 501.) Janssen also reports that Pimentel "would benefit from the assignment of a Medicaid Service Coordinator to assist her with needed services." (*Id.*)

### (6)    Dr. Sharon Revan, M.D., Internal Medicine

Pimentel was referred to Dr. Sharon Revan ("Dr. Revan"), a medical doctor specializing in rheumatology,[14] "by the Division of Disability Determination for an internal medicine examination." (*Id.* at 477.) Dr. Revan did a consultative examination on October 8, 2015. (Tr. at 477, 479.) Dr. Revan reports that Pimentel "has [had] ADHD and LD all her life." (*Id.*) She notes that Pimentel "showers and dresses herself." (*Id.*) Dr. Revan reports that Pimentel has had "no hospitalizations" and is currently taking "no medications." (*Id.*) Pimentel "helps occasionally with cooking, cleaning, laundry, and shopping." (*Id.*) Dr. Revan also reports that Pimentel "states she is lazy." (*Id.*) Pimentel "watches TV, listens to radio, reads, goes to the movies, socializes[,] and follows up with her doctor." (*Id.*) Dr. Revan performed a primarily physical examination of Pimentel, which showed normal results with the exception that Pimentel wears glasses. (*See id.* at 478.) Dr. Revan opined that "[Pimentel] has no limitations with her speech, vision, [] hearing[,] . . . with upper extremities for fine and gross motor activity[,] . . . [or with] sitting, standing, lying down, walking, and climbing stairs." (*Id.* at 479.) Dr. Revan notes that Pimentel has "[n]o limitation with personal grooming" and a "[m]ild limitation with activities of daily living." (*Id.*)

### b.    Teachers' Reports & Comments

### (1)    Individualized Education Program

While in the twelfth grade and at twenty years of age, Pimentel was evaluated by the New York City Board of Education, resulting in an IEP, dated May 5, 2011. (*Id.* at 124.)

---

[14] U.S. News & World Report, *Dr. Sharon Revan*, HEALTH CARE, http://health.usnews.com/doctors/sharon-revan-521569 (last visited Jul. 25, 2017).

In the area of reading and writing, Pimentel's independent reading level was at a fifth grade instructional level, her overall reading level was at a fifth grade instructional level, and her instructional reading level was at an eighth grade instructional level. (*Id.* at 126.) Pimentel's "strengths are in summarizing, predicting, and making inferences." (*Id.*) She "struggles to evaluate written material." (*Id.*) Pimentel "participates in class, but she sometimes needs prompting." (*Id.*) She is "described as loving to read and always being in the NYU library." (*Id.*)

In the area of math, Pimentel's calculations skills were at a sixth grade instructional level and her overall math skills were at a fifth grade instructional level. (*Id.*) She is "proficient in adding, subtracting, multiplication and division, but is in the process of improving [those] skills . . . [of] numbers [with] three or more digits." (*Id.*) Pimentel "needs support in solving word problems." (*Id.*)

Pimentel's academic management needs include "directions [to be] repeated and rephrased as needed," "frequent prompting," and "extra time to process information for verbal and written classwork." (*Id.* at 127.) Pimentel "has been interning at the Mulberry Street Library since September [] 2010[,]" and "[s]he is well liked by her supervisor and has been working independently for some time now." (*Id.* at 128.) The library has "asked her to work there over the summer as well." (*Id.*) Pimentel "wants to work in a library as a long term career goal" or "in a large bookstore." (*Id.*) She is "working on improving her life skills to prepare for independent living" and is "developing self-advocacy skills." (*Id.*)

Pimentel "has a diagnosis of ADHD for which she does not take medication." (*Id.* at 129.) She "wears glasses," "has weaknesses in the area of fine motor skills for which she receives occupational therapy," and is "described as being in good health." (Tr. at 129.)

Pimentel was found to be "too high functioning academically" for a "specialized class in a specialized school." (*Id.* at 136.) Accomodations for Pimentel were to include "time limits extended to double-time with [five] minute breaks as needed," "questions to be read aloud that do not measure reading," "directions to be read and reread aloud," "use of calculator for word problems," and "answers [to be] recorded in any manner." (*Id.* at 137.)

### (2)    Teacher Questionnaire

The New York State Office of Temporary and Disability Assistance Teacher Questionnaire was completed by the head teacher and administrative coordinator (collectively, "respondents") at Cooke Academy Center for Learning from October 3, 2011, to November 23, 2011.[15] (*Id.* at 154, 161.) The respondents indicated that they see Pimentel "[n]inety minutes [per day,] five times a week. (*Id.* at 154.) Pimentel was in the "12+" grade level, but was at a "6" instructional level for reading (seventh percentile), a "5.5" instructional level for math (twelveth percentile), and a "5.5" instructional level for written language. (*Id.* at 154, 162.)

In "acquiring and using information," the respondents indicated that Pimentel "needs extra support through written and verbal prompts when completing a task" and she "always receives verbal support when working on minor tasks and receives written and verbal support for larger tasks." (*Id.* at 155.) In "attending and completing tasks," Pimentel "struggles to stay focused in the classroom, [] gets easily distracted and often exhibits disinterest or lack of motivation while in academic classes." (*Id.* at 156.) Pimentel "has trouble focusing for long periods of time and often makes careless mistakes [due] to a lack of focus." (*Id.*) In "interacting and relating with others," Pimentel experiences the most trouble with "[r]elating experiences and telling stories." (*Id.* at 157.) The questionnaire indicates, however, that it has not "been

---

[15] Signatures of their names are illegible. (Tr. at 161.)

necessary to implement behavior modification strategies" for Pimentel. (Tr. at 157.) In the
"moving about and manipulating objects" category, Pimentel "is often lethargic and moves
slowly." (*Id.* at 158.) The respondents note that "[w]hile [Pimentel is] engaging in fitness
activities, she shows little coordination ability" and "struggles to remember details." (*Id.*) "She
is very forgetful." (*Id.*) The respondents also noted that Pimentel "struggles to care for herself at
home as reported by her guardian" and "struggles with coping with the demands placed on her."
(*Id.*)

### (3) Adaptive Behavior Assessment

Pimentel was administered the Adaptive Behavior Assessment System-Second Edition
("ABAS-II") on October 3, 2011, resulting in an Interpretive Report on October 14, 2011. (*Id.* at
164.) "[Pimentel's mother] … completed the ABAS-II Parent Form on 10/3/2011." (*Id.*) "The
General Adaptive Composite score (GAC) summarizes performance across all skill areas
excluding [w]ork." (*Id.* at 165.) "Because the GAC provides the most complete measure of
adaptive behavior, it is likely to be the most reliable and accurate estimate of overall adaptive
functioning." (*Id.*) Pimentel's "[c]onceptual composite score," which "summarizes
performance across the Communication, Functional Academics, and Self-Direction skill areas,"
was 81, which is in the "Below Average range." (*Id.*) Pimentel's "[s]ocial composite score,"
which "summarizes performance across the Leisure and Social skill areas," was 88, which is in
the "Below Average range." (*Id.*) Pimentel's "[p]ractial composite score," which summarizes
performance across the Community Use, Home Living, Health and Safety and Self-Care skill
areas, is 70, which is in the "Extremely Low range."[16] (Tr. at 165.)

---

[16] "[Pimentel's] overall adaptive behavior can be characterized as lower functioning than most children her age.
[Pimentel's] conceptual adaptive behavior can be characterized as somewhat lower functioning than is typical for
her age. [Pimentel's] social adaptive behavior can be characterized as somewhat lower functioning than is typical

In comparing discrepancies in Pimentel's scores, the report indicates Pimentel's "overall functioning in the areas of communication, academics, and self-direction (conceptual adaptive behavior) is significantly more developed than her general skills in the areas of community and home living, health and safety, and self-care (practical adaptive behavior)." (*Id.*) "Additionally, [her] overall ability to practicpate in social and leisure activities (social adaptive behavior) is significantly more developed than her general practical adaptive behavior."[17] (*Id.*)

### 4.      The ALJ's Decisions

On January 3, 2013, ALJ Tannenbaum issued his decision denying Pimentel's application for SSI. (Tr. at 18.) The ALJ followed the required five-step sequential analysis to make his determination of disability. 20 C.F.R. § 416.920(a)(4). He ultimately found that Pimentel was "not disabled under section 1614(a)(3)(A) of the Social Security Act" because she did "not have an impairment or combination of imparments that meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926.)" and that Pimentel "has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is restricted to simple work involving one or two-step instructions because of her cognitive limitations and poor memory." (Tr. at 20-22, 26.) This decision was appealed and both parties stipulated to remand for further administrative proceedings. (*Id.* at 290, 292.) The Appeals Council directed the ALJ to (1) "[o]btain additional evidence concerning [Pimentel's] impairments to complete the administrative record in accordance with the regulatory standards, including an updated psychological consultative examination," (2) "[e]valuate [Pimentel's] mental impairment in

---

for her age. [Pimentel's practical adaptive behavior can be characterized as lower functioning than that of almost all children of her age." (Tr. at 166.)

[17] The "[r]ecommended [i]nterventions" for Pimentel regarding adaptive functioning are listed in its entirety as part of the ABAS-II Report. (Tr. at 170-81.)

accordance with the special technique described in 20 CFR 416.920a . . . ," (3) "[g]ive further consideration to the treating and nontreating source opinion . . . ," (4) "[g]ive further consideration to the claimant's maximum [RFC] and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations," and (5) "[i]f warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . ." (Tr. at 366.)

On December 21, 2015, ALJ Tannenbaum issued his second decision denying Pimentel's application for SSI. (*Id.* at 276.) The ALJ followed the required five-step sequential analysis to make his determination of disability. 20 C.F.R. § 416.920(a)(4). First, he established that Pimentel has not been engaged in substantial activity since August 23, 2011. (*Id.* at 278.) Second, the ALJ found that Pimentel had two severe impairments: a learning disability and ADHD. *Id.* Third, ALJ Tannenbaum found that although Pimentel suffered from severe impairments, she did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, and was therefore not presumptively disabled. (*Id.*)

Before considering the fourth step, ALJ Tannenbaum first determined Pimentel's RFC. (*Id.* at 280.) The ALJ found that Pimentel had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine, and repetitive work. (*Id.* at 281.) ALJ Tannenbaum found that, although Pimentel's medically determinable impairment could reasonably be expected to cause the alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. at 281.) Specifically, ALJ Tannenbaum noted that Pimentel graduated high school with a special education diploma and an "evaluation done in 2006 indicated that her

overall intellectual abilities to be in the Borderline Range, while her basic academic skills varied and fell between the Average to Borderline range." (*Id.* at 281-82.) The ALJ also noted that Pimentel was diagnosed with ADHD in 2003 and discontinued her use of medication for it in the 12th grade. (*Id.* at 282.) The ALJ also states that Pimentel's WJ III COG "indicated that her general intellectual ability to be 69, which falls in [the] very low range of cognitive functioning, limited in short term and long-term memory." (*Id.*) The ALJ noted that a school psychologist indicated Pimentel exhibited "functional knowledge of basic academic skills" and "great difficulties with higher-level academic skills." (*Id.*) The ALJ states that "[a] teacher questionnaire from November 2011 confirms that the claimant needs extra support through written and verbal prompts when completing a task," but "her internship evaluation in the fall of 2010 indicated that she 'mastered her job duties and demonstrated initiative by taking on additional tasks and responsibilities.'" (*Id.*)

Dr. Alexander, a consulting psychologist, examined Pimentel in December 2011. The examination was largely normal with intact attention, concentration, and memory. (*Id.* at 282.) The ALJ notes that "[a] State agency psychologist concurred with the consultative examiner as to the claimant's functional abilities and concluded that she was capable of 'low SVP' work." (*Id.*) The ALJ gives significant weight to the opinion of Dr. Revan, the consultative examiner and internal medicine specialist, because "it reflects the claimant's actual level of physical functioning." (*Id.*)

ALJ Tannenbaum also weighed the medical opinion evidence to inform his determination of Pimentel's RFC. (*Id.* at 283-84.) He assigned "considerable weight" to opinions of Dr. Alexander and Dr. Inman-Dudon because "it reflects [Pimentel's] actual level of psychological functioning" and her "ADHD is not imposing significant work-related limitation of function."

28

(Tr. at 283.) He gives significant weight to the Woodcock-Johnson test results, but little weight to Brigatti's conclusion that the claimant is in the very low range of cognitive functioning. (*Id.*) He states that "[t]his conclusion is clearly not supported by [Pimentel's] current college attendance on a full time basis" and the "undersigned considered [Pimentel's] difficulties in complex problem solving and limited [her] to simple, routine and repetitive work." (*Id.*) The ALJ did not cite nor assign weight to the consultative opinions of Dr. Louick or Elaine Janssen, the licensed social worker, nor did he discuss Pimentel's Adaptive Behavior Assessmnet from October 2011.

At the fourth step, ALJ Tannenbaum determined that Pimentel had no past revelant work and transferability of job skills is not an issue because [Pimentel] does not have past relevant work. (*Id.* at 284.) Finally, at the fifth step, ALJ Tannenbaum determined that considering Pimentel's age, education, work experience, and RFC, there are jobs that exist in signficiant numbers in the national economy that Pimentel can perform, but he does not explain any further. (*Id.* at 284-85.) ALJ Tannenbaum concluded that Pimentel was not disabled from August 23, 2011, through December 21, 2015. (*Id.* at 285.)

## C.     Appeals Council Review

On March 6, 2013, Pimentel's attorney submitted a request for review of the ALJ's decision to the Appeals Council. (Tr. at 14.) The Appeals Council denied Pimentel's request for review on May 6, 2014, and the ALJ's decision became the Commissioner's final decision until both parties stipulated to remand on November 4, 2014. (*Id.* at 1, 290, 292.) Following remand, the ALJ denied Pimentel's application for SSI. Pimentel filed her Complaint in this action on February 23, 2016. (Doc. No. 1.)

# III.   DISCUSSION

## A.   Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g), 1383(c)(3). Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42

U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. § 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Eriksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d

Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

**B.     Determination of Disability**

**1.     Evaluation of Disability Claims**

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at § 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. § 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the

claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. § 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. § 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty

performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. § 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. § 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. An ALJ should not consider whether the severity of an individual's alleged symptoms is supported by objective medical evidence. SSR 16-3P, 2016 WL 1119029, at *3. Second, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ must consider the entire case record, including objective medical evidence, a claimant's statements about the intensity, persistence, and limiting effects of symptoms, statements and information provided by medical sources, and any other relevant evidence in the claimant's record. SSR 16-3P, 2016 WL 1119029, at *4-6. The evaluation of a claimant's subjective symptoms is not an evaluation of that person's character. (*Id.* at *1.)

In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2. The Commissioner's Duty to Develop the Record

The ALJ generally has an affirmative obligation to develop the administrative record. 20 C.F.R. § 404.1512(d); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security

34

proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Under the Act, the ALJ must "make every reasonable effort to obtain from the individual's treating physician ... all medical evidence, including diagnostic tests, necessary in order to properly make" a determination of disability. 42 U.S.C. § 423(d)(5)(B). Remand to the Commissioner is appropriate when there are "obvious gaps" in the record and the ALJ has failed to seek out additional information to fill those gaps. *See Lopez v. Comm'r of Soc. Sec.*, 622 Fed. Appx. 59 (2d Cir. N.Y. 2015) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

**C.     Issues on Appeal**

Pimentel argues that the Commissioner's decision denying her application for SSI should be reversed, or alternatively remanded, for further proceedings because (1) Pimentel meets the requirements of the Commissioner's listing for intellectual disability, 12.05.C and (2) the record is complete so "there is no legally compelling reason to remand." (Doc. No. 20 at 16-37.) The Commissioner argues that the case should be remanded for further administrative proceedings because (1) the ALJ did not fully develop the record and (2) the evidence is not conclusive of a disability warranting reversal for calculation of benefits. (Doc. No. 22 at 3-10.) Pimentel replies arguing (1) that remand for further development of the record is unnecessary, (2) Pimentel meets the 12.05.C listing requirements, and (3) the Commissioner has not shown good cause for remand. (Doc. No. 23 at 1-10.)

Because the Parties agree that remand is appropriate and disagree only on the scope of remand, this case presents essentially one question: Does the record establish that Pimentel has one of the impairments listed in Appendix 1 of the regulations, or its equivalent? For the reasons which follow, the Court remands for further administrative proceedings.

### 1. Pimentel Does Not Necessarily Meet the Disability Listing, 12.05.C

Pimentel argues that she meets the requirements for intellectual disability under listing 12.05.C, step three, because (1) her I.Q. is in the proper range; (2) she has shown the necessary deficits in adaptive functioning; and (3) the evidence proves the existence of another impairment imposing additional and significant work-related limitation of function. (Doc. No. 20 at 16-33.)

Listing 12.05.C, Mental Retardation, requires "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age [twenty-two], with one of the following . . . (3) A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." (Tr. at 259.)

First, Pimentel argues her I.Q. is in the proper range because (1) the conflicting I.Q. scores of 69 and 72 are "not actually different" because they are within the same standard deviation of one another; and (2) "slightly higher [I.Q.]'s (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination." (Doc. No. 20 at 19-20.) Pimentel also argues that "no competent psychologist would say that [her] score of 72 indicates either that her 2010 score of 69 was incorrect or that her [I.Q.] 'improved' over the three year interval between the tests" and "[w]ithin the margin of error the test results are the same." (*Id.* at 20.) Pimentel's "point is that her completely valid [I.Q.] score of 69 does satisfy [the] requirement, and that a subsequent re-test within the SEM [(standard of error measurement)] is neither medically nor legally a basis for disregarding it." (*Id.* at 21.)

Pimentel argues further that "a person with an [I.Q.] score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower [I.Q.] score." (*Id.* at 22-23.) She argues that the evidence proves "her adaptive functioning is indeed lower than what someone with an [I.Q.] of 72 would normally have" and "even if the 2013 test [where she scored a 72 was] the only test of her [I.Q.], her condition would still satisfy the requirements of the listing." (*Id.* at 23.)

The Commissioner argues that if she had "wished to promulgate regulations setting the standard for the listing at 72 rather than 70 she could have done so," and "[t]here is no requirement that a score of 72 be considered to meet the listing because there is a margin of error in [I.Q.] scores." (Doc. No. 22 at 5, n.3.) The Commissioner also argues that the "psychologist who performed the [2013 I.Q.] test stated that [Pimentel's] full scale score 'is not a reliable indicator of her overall cognitive abilities,' and that the 'variability in [sub]test scores may be suggestive of a learning disability.'" (*Id.* at 22.) The Commissioner states "it is necessary to obtain updated psychological testing to resolve the discrepanices in the current record and allow for comparison of valid scores to the regulatory standard." *Id.*

The Court agrees with the Commissioner, and a psychologist should analyze the discrepancy and variability of the I.Q. scores, rather than Pimentel or the Court.[18]

Second, Pimentel argues that she meets the listing because she "has shown the necessary deficits in adaptive functioning." (*Id.* at 23.) Adaptive functioning is "an individual's ability to cope with the challenges of ordinary everyday life" and "[w]hile a qualifying [I.Q.] score may be *prima facie* evidence that an applicant suffers from 'significantly subaverage general intellectual functioning,' § 12.05, there is no necessary connection between an applicant's [I.Q.] scores and

---

[18] Pimentel argues correctly that there is a margin of error in IQ scores, but urges the Court to find that variation occurs in only one direction.

her relative adaptive functioning." *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012).

Pimentel states that because (1) she "was in special education from age seven until she graduated high school at age twenty;" (2) teachers stated that she had "serious" or "very serious" issues in multiple areas of learning; (3) she relies on reminders and help from her aunt for daily living; (4) "[s]he cannot travel alone to unfamiliar places;" and (5) she has not had a real job or lived independently, "her adaptive functioning is very limited." (*Id.* at 24-25.) She states that the ABAS-II test administered in 2011 revealed "an overall General Adaptive Composite score of 75, placing her at the 5th percentile for her age group" and in the Vineland-II Adaptive Behavior Scales administered in 2013 "she [] functioned below the 1st percentile" in the "broad domains of communication and daily living skills." (*Id.* at 26-27.) Pimentel states that "[h]er overall adaptive functioning was significantly worse than her [I.Q.] scores would normally suggest." (*Id.* at 27.)

The Commissioner argues that "the record fails to demonstrate deficits in adaptive functioning" because, "despite her ADHD, learning disability, and possible intellectual disability," she did well at her internship at the library; proving she was "hard working, committed, and responsible" and "made a great deal of progress working independently and gaining mastery of the required job tasks and routines." (Doc. No. 22 at 7.) The evidence of Pimentel's adaptive functioning is conflicting and questionable because although the test scores, teachers' comments, and hearing testimony show that she has difficulty in certain areas of adaptive functioning, she functions normally in other areas such as going to college and her prior work at the internship, even though she had difficulty in obtaining employment after the internship. *See supra* pp. 8. "It is for Social Security Administration . . . to weigh the conflicting evidence in the record." *Schaal v. Apfel*, 134 F.3d 486, 504 (2d Cir. 1998). Further, it would take

fully developing the record and another consultative psychological analysis (as was previously requested of the ALJ) to reveal whether or not her adaptive functioning was truly limited given the conflicting evidence.

Third, Pimentel argues that she meets the 12.05 disability listing because "[t]he evidence proves the existence of another impairment imposing additional and significant work-related limitation of function." (Doc. No. 20 at 28.) Pimentel states that "the ALJ twice found that her ADHD constituted a severe impairment," therefore "satisf[ying] the second prong of 12.05[.]C." (*Id.* at 29.) The ALJ, however, stated that her "ADHD 'is not imposing a significant work-related limitation of function,'" which Pimentel argues "is . . . the definition of a 'severe' impairment," thus implying the ALJ contradicted himself in finding she met step two of the inquiry and not the second prong of the 12.05.C listing. (*Id.*)

Finally, Pimentel argues that she qualifies for benefits under Listing 12.05.D, which requires an I.Q. between 60 and 70, and "marked restrictions in 2 out of 4 functional areas." (Doc. No. 20 at 32.) This listing, however, still requires "[I.Q.] test scores in the 60 to 70 range," where there remains a discrepancy to be analyzed by further administrative proceedings. (*Id.*) Pimentel states that she "has not emphasized [the Listing 12.05.D] claim because, frankly, Listing 12.05[.]C is easier to satisfy." (*Id.*)

The Court remands this case for explicit consideration of evidence not yet incorporated into the record, including the a consultative psychologist and a treating psychiatrist.

### 2. The ALJ Failed to Fully Develop the Record

Pimentel argues that "there is no legally compelling reason to remand this claim for additional administrative proceedings." (Doc. No. 20 at 33.) She argues that she meets the 12.05.C listing based on the current record and it does not need to be further developed because

it is already fully developed. Pimentel states that the "district court should award benefits in disability claims under the SSA if there is 'persuasive proof of disability and remand for further evidentiary proceedings would serve no purpose.'" (Doc. No. 20 at 33.); *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). Pimentel argues that "[o]utright reversal is particularly appropriate where the record is complete, i.e., where the ALJ 'reached a mistaken conclusion on an otherwise complete record,' or where there is 'no apparent basis to conclude that a more complete record might support the Commissioner's decision.'" (Doc. No. 20 at 33.); *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999). Pimentel argues that the court in *Castillo v. Barnhart* "rejected the Commissioner's request that the case be remanded to obtain additional evidence of the claimant's [I.Q.], to obtain expert testimony about whether his ADHD was severe, or for the ALJ to more adequately explain his decision" when "the ALJ had found both that the claimant had an [I.Q.] in the qualifying range, and that his ADHD constituted a severe impairment." (*Id.* at 34.); quoting *Castillo v. Barnhart*, 00-CV-4343 (MBM), 2002 U.S. Dist. LEXIS 19026 at *43 (S.D.N.Y. Oct. 8. 2002).

In the Commissioner's cross motion, she argues that the ALJ failed to fully develop the record. (Doc. No. 22 at 3.) The ALJ must attempt "to fill any clear gaps in the administrative record." *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quoting *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999)). The Comissioner argues that "reversal for calculation of benefits is appropriate only when there is 'no apparent basis to conclude that a more complete record might support the Commissioner's decision.'" (Doc. No. 22 at 6); quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 19).

In *Castillo v. Barnhart*, the Commissioner conceded "that the ALJ did not adequately explain why" the claimant did not meet a listing. *Castillo*, 2002 U.S. Dist. LEXIS 19026 at *25.

The Commissioner here concedes that "[a]lthough the ALJ mentioned some evidence regarding [Pimentel's] adaptive functioning . . . , he did not make a determination as to whether [she] had 'deficits in adaptive functioning' as required to meet the standard in section 12.05." (Doc. No. 22 at 6.) The Commissioner states the ALJ did not fully develop the record and therefore he "erred in analyzing" the question "concerning whether [Pimentel] met the requirements of section 12.05.C of the listing of impairments." (*Id.* at 3.) The Court recognizes that the ALJ took steps to assist Pimental and her counsel to develop the record. The Commissioner, however, states that "[o]n remand from the district court, the Appeals Council directed the ALJ to obtain an 'updated psychological consultative examination'" and instead he sent "plaintiff for an internal medicine consultative exam." (*Id.* at 4.) The Commissioner contends that "[w]ithout the updated psychological testing, it cannot be determined whether plaintiff meets the requirement of section 12.05[.]C that she have a 'valid verbal, performance, or full scale [I.Q.] of 60 through 70.'" (*Id.*) Further, the Commissioner explains that during the December 2015 hearing Pimentel testified that she "was currently seeing a psychiatrist" and had been for two (2) years, but "that psychiatrist was not identified, and there is no indication that records were obtained from that treating source." (*Id.* at 5, Tr. at 302, 317.)

Pimentel replies stating that she "would have submitted" records from the psychiatric counseling received "at the time of the second hearing" if she "thought that information about this counseling was relevant to her claim." (Doc. No. 23 at 2.) She also continues to maintain in her reply papers that she meets Listing 12.05.C. (*Id.* at 3-9.) Finally, Pimentel contends that "[t]he Commissioner has not shown good cause" for remand because she "has failed to persuade that a third ALJ hearing would be beneficial" and "she has also failed to explain why the new

evidence with which she now seeks to supplement the record was not offered during half a decade of prior proceedings." (*Id.* at 9-10.)

The Court disagrees. The Commissioner has explained that without a real assessment of the discrepancy between the two I.Q. scores, and with the lack of evidence from a few medical sources, determining whether Pimentel meets a listing is not possible. Further, it is the ALJ's duty to consider Pimentel's claim in light of all the evidence, and not just that which Pimentel considers to be relevant.

The Court agrees that remand is warranted for further development of the record. The claimant in *Castillo* did not have two conflicting full scale I.Q. scores, one within the qualifying range and one, outside. *Castillo*, 2002 U.S. Dist. LEXIS at *24, *40. Unlike the claimant in *Castillo*, where the court found he met both prongs, Pimentel may meet the second prong of the listing, but it is questionable whether she meets the first prong of the 12.05.C listing. *See Castillo*, 2002 U.S. Dist. LEXIS 19026 at *43. The discrepancy between the scores should be analyzed either by a psychologist and/or by the ALJ further developing the record, rather than by the Court. Additionally, the ALJ also failed to develop the record on Pimentel's mental impairments by relying on an opinion from a doctor whose specialty is in internal medicine instead of the opinion of a consultative psychologist as the Appeals Council had instructed. Further, the lack of records from a treating psychiatrist may bear on the ALJ's determination of Pimentel's RFC and ability to work. Without more information from a consultative psychologist and Pimentel's treating psychiatrist, a detailed discussion of Pimentel's mental health impairments is not possible.

### 3. Remedy

Under 42 U.S.C. § 405(g), the Court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for further proceedings. Where an ALJ has committed a legal error that may have affected the disposition of the case, such failure constitutes reversible error. *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004). Remand may be appropriate if "the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). Because ALJ Tannenbaum failed to fully develop the administrative record, the ALJ's decision is reversed and the case is remanded for further administrative proceedings. On remand, the Commissioner is directed to fill any clear gaps in the administrative record, consistent with this opinion.

## IV. CONCLUSION

For the foregoing reasons, Pimentel's motion is **DENIED**, the Commissioner's motion is **GRANTED**, and the case is **REMANDED** pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion and Order.

This resolves the gavels at Doc. Nos. 19 and 21.

**SO ORDERED this 29th day of September 2017.**
**New York, New York**

The Honorable Ronald L. Ellis
United States Magistrate Judge